All right, good morning to you both. So on this matter, each case will also have 15 minutes. I do understand that we have a cross appeal here, but it is our intent to treat this as a single appeal for purposes of your time at the lectern. So please be aware you each have 15 minutes. If the appellants would like to reserve time for rebuttal, it's your responsibility to reserve and keep track of that time. And Mr. Billick, yeah, you may begin. Thank you, Your Honors, and may it please the court. I'd like to reserve two minutes of my time for rebuttal. My name's Tim Billick. I'm the attorney for the Aquarian Foundation, and I'd like to thank you for taking the time today. Also with me today in the gallery are members of the board of the Aquarian Foundation. First issue I'd like to address is that as a matter of law, the 221 church works, that's the 177 registered and the 44 proprietary works, should be considered work for hire because Keith Milton Reinhart, as an employee, created those works pursuant to his employment agreement using church resources. But the district court erred by refusing to acknowledge any of those facts and, as best as can be gleaned from the court's findings of fact, simply looked at the registration certificates and then moved on. The district court performed no work for hire analysis, applied no legal standard, and under Ninth Circuit precedent, that exercise is reviewable de novo. Well, looking at it de novo, let me just go back and get your understanding on the work for hire. We know he was an employee, but that's not the absolute deciding factor, as you know. So a couple questions I have here. Here, we actually have the board explicitly authorizing him to register the copyrights in his name. That, it seems to me, coupled with our case law, I think it was the Church of Self-Realization, that kind of distinguishes between religious leaders and your, what I'll call, the run-of-the-mill work for hire employee. Can you really give us your view on how those factor in to your claim that this was a work for hire? Thank you, Your Honor, and that is getting straight to the heart of the issue. Right. As far as why this case ought to be treated somewhat differently than the self-realization case. In self-realization, the, well, excuse me. Here, in our case, the splinter church that was started by Lowndes was started before Reverend Reinhart's death, and we, and also distinct here, we have testimony from the church, we have bylaws, and we have articles of incorporation that very clearly spelled out what the duties of the ecclesiastic head were, are, and we also have bylaws and testimony and articles of incorporation that very clearly spell out that contracts dealing with the payment of money are to be approved by the board, and without that board approval, the alleged license that I'm sure we'll get to later, without approval from the board, that license is null, it's void ab initio, because there was no approval to ratify that license. So that kind of jumps ahead to license, license termination, but going back to works for hire, my understanding from reading the record is that one of the reasons that they decided to let Reinhart put these in his own name is so he could make these publication decisions and the integrity of the work, which kind of goes along with the self-realization notion of he's the creator of this, I don't wanna call it religious, is religious a fair word to use? Yes. Okay. Yes. Of these religious works, so the record, everything in the record seems to point along with the X on the copyright registration that these were not works for hire. So I have, what I'm kind of waiting to hear is something that would contravene that. Understood, yes. So thank you for redirecting. So distinct from the self-realization case, what we have here are, we have facts showing that the church dedicated resources to creating these works. We have facts that Reverend Reinhart was paid a salary. We, and also distinct from self-realization, part of the resources issue is that creating these works, many of these works where the apportations were occurring. I believe this is the video exhibit that we submitted in the record. As you can see from the video, like doing these kinds of works took a team of people. It's not one person would be able to create these works. Sure, Reverend Reinhart, undisputably, was directing the substance and was directing the, many of the teachings. But at the end of the day, these are, these copyrights are resources. These are assets rather. These are assets that were created with church resources. We don't have those kinds of facts. Was Reverend Reinhart ever told by the board that he had no authority to license this material? There is no facts in the record stating that. So the answer is no. That is correct. And did the board at any time have a policy about what constituted works for hire? Is, there's no facts in the record for that. So the answer is no. What we do have though, is within the Articles of Incorporation, the stated rule, and within the bylaws that, again, I'm gonna be jumping ahead to the license here, that licenses or contracts dealing with the payment of money do have to be approved. And as far as why protecting the integrity of the message does not immediately equate to ownership, like you can have a person who is the shepherd of the message of a church, but at the same time you can have someone else actually own them and have the rights to it. It's like the director on a movie set. I still haven't heard why, kind of the flip side of Judge Hawkins' question where here the board explicitly authorized to put them in his name. So if the copyright is in his name, I wanna now jump ahead to your license question. If it's in his name, why couldn't he then license it? Isn't he the owner of the copyright if he's the registered owner? This is where it gets complicated. Yes, and because under Ninth Circuit precedent, what's on the face of the copyright certificate is not the end of the question.  Right, and so what we have here is we have these, what is undisputed is the employment relationship. What is undisputed is the resources that were dedicated to creating these works. And we have a man who was part of this church pretty much his entire adult life from 1955 until his death in 1999. And so we have evidence in the record that the church did rebut this presumption of some of the information that is on these registration certificates. And one of the church's problems with the court's decision is that there was literally no discussion of any of these facts. And based on Ninth Circuit precedent, the church submits that between the articles of incorporation and the bylaws and all the resources and the fact that these works were created pursuant to his very clearly stated job description, that that creates the legal relationship of which a piece of paper does not necessarily outweigh is the church's position. So please clarify for me, counsel, was Mr. Reinhart, was it an accident that he had the copyrights under his name directly and not Aquarian? Was that on purpose? Was that strategic on behalf of Aquarian? And I asked because I saw as part of the evidence submitted, there's a declaration from Reverend Warner wherein she states that all published and unpublished works were required to be copyrighted as Reverend Reinhart's name while he was alive so that Reverend Reinhart as the author of the materials could maintain the integrity of the works and make publication decisions concerning which works would be used for publication to promote the teachings of the Aquarian Foundation. So I guess I'm wondering, I mean, it seems like it was very intentional. I don't know why that couldn't have been limited works for hire, check the box. I wasn't there and certainly that is a fair implication from that statement from Ms. Warner. But again, it's our position that it's a very important distinction from someone controlling the integrity of the message versus actually owning these works. And we see later on towards the end of Reinhart's life that between putting the residuary clause in his will, that everything's gonna go to the church, there are a handful of registration certificates later on that do in fact say, hey, this is, I think it's in box 4B as in boy. There is a box that says this is going to be owned by the Aquarian Foundation pursuant to my will. So we do have evidence of intent that the church is going to be owning these things. It's also evidence of Reverend Reinhart's ownership of these materials in that he had to express in a written document that they would go up on his demise would go to the church, correct? That is correct. That is correct. So if you jumped into the license, leave work for hire, let's say he, Aquarian acquires all this as you've just said, pursuant to the will, correct? Things get transferred back. That's correct. And then Aquarian terminates the Loundis license, correct? Correct. So the conundrum you have is Aquarian is not a statutory heir. It's an heir by virtue of the will, of course. But how do you square the, if the license is terminated by Aquarian being legitimate, how do you square that with the Reno case? In so far as, you know, why Reno does not apply here? Correct. Okay, thank you. The, in Reno, excuse me, well here, what we have is, again, we have additional facts of that the church was intended to own these things sort of outright. And if not outright, the church would own these works eventually. Also distinct is we have probate orders saying that the assets have in fact been transferred to the church. And going from memory here, I don't believe those types of facts are in Reno. And unless this court has additional questions, I'd like to remain my last one minute for rebuttal. Okay, thank you, counsel. Thank you. Thank you. All right, Mr. Wolf. Morning. Good morning. I represent the appellee, Bruce Lowndes. The court should confirm the dismissal of this case for two central reasons. First, because Aquarian never received these copyrights either by a conveyance or through a will that had been fully probated and administered. And secondly, at trial it was proven that Reinhard was the owner of these copyrights, that they were not works for hire, that he granted Mr. Lowndes a license to use them, and that that license was never properly terminated. Now, the Copyright Act, Section 201, allows two and only two methods for transferring a copyright, conveyance or by operation of law, which would include through a will or intestate succession. There was never a conveyance in this case. There's no document that has been submitted. The Aquarian did not allege that there was any conveyance. In fact, in their second amended complaint, paragraph 26, they allege that to the extent Reinhard owned any rights, they obtained them by will. Likewise, the court in finding number 17 found that Aquarian Foundation's ownership of the copyrights came through a will. Okay, so it is only a will that we are dealing with. Now, there was some suggestion by Aquarian that there may have been a conveyance involved because of certain statements that a personal representative made. But if you take a close look at those, that was a declaration submitted in 2021 relating to events 20 years earlier. It was a one-page handwritten declaration and didn't say whether the conveyance was made in writing or whether it was signed, which are both requirements under Section 204 for an effective conveyance. So if there isn't a conveyance, let's examine whether it was passed through a will. First of all, the first thing you need to know is that the transfer of rights under a will, the transfer of property rights is uniquely a function of state law and state process. And the transfer, whether someone receives something by a will is not just simply judged by the four corners of the will. It is also judged by looking at the process by which it was probated and administered. One thing I would like to correct on the record, the will in this case made no reference to any copyrights. What it said was that Aquarian was the residuary legatee of all of his assets after the payment of his debts and administrative expenses. But see here, if a will is, what happened in this probate is that the will was initially filed, a personal representative was appointed, but then the case drug on and on, and there were a succession of status conferences, what's the status of this? At the last few, the personal representative didn't show up, and the case was dismissed without the administration ever being completed. Now, a completed administration is absolutely necessary to transfer an interest. What is your best citation for that? Yeah, Your Honor, the citation for that is the Haviland case, which states, this is, excuse me, yeah, the state of Haviland states, it holds that a present interest in property is only acquired when a final judgment is entered, distributing property to, by the probate court. In that case, the court dealt with the Slayer statute, which was a recent enactment, and they had to determine if the wife's rights had been vested because the estate was still open. So you- But how does that apply if you have a personal representative with non-intervention powers? Because that's what we have, that's the real question here. Yeah, the- And the Slayer statute doesn't, I mean, the Haviland case isn't really on point, it seems to me. Well, I also cited to the court another case, which I actually dealt with exactly the same fact pattern here, where someone had failed to appear at the status conferences, and that's the case of Erickson v. Stenman, a Division II case, which appears at page 17 of our brief. And what that case involved was a daughter who was trying to challenge, her father property had been foreclosed on, and she was trying to challenge it. But the probate in that case of her dad's estate had been dismissed, just like here, because she hadn't appeared at the conferences. And in that case, the court held that she had no vested interest as to support the action. The court said, and I quote at page five, it said, Ryan's estate entered probate, but probate was closed due to the personal representative's failure to appear at mandatory hearings. No final judgment distributing the property was entered. That's the exact same fact pattern as we have here. If there's any question about it, when you look at the final order by which the court closed the case, it makes the statement that quote, this order is not a final adjudication of any issues in this matter, okay? Because until you get that order of distribution, there are a variety of things that can happen. The will could be challenged as being invalid, a successive will. A successive will might be found. A, the estate could prove insulting. A lot of things could happen, but the question is what did happen. And if in fact, you can basically transfer through these non-intervention powers that the individual had, and then it's not challenged, nothing happens. I don't know why that wouldn't serve as a legal foundation. Now, as we sit here today, 20 years removed from these events, we don't know, can't say whether those things would have happened. That's true. However, it's the fact that they might happen. It's the fact that they might happen, which makes it not a vested right. There is a statute which describes what happens at the close of probate. And it says that there is to be a distribution order of all the property. There's another statute I quoted that says that you can apply for an interim distribution. Okay, so those are the statutorily prescribed methods by which this property is transferred. The last thing I would gotta say is when you look at the statutory framework is that there actually is a statute out there that relates to real estate. And it says that real estate interests vest automatically upon death. And interestingly, there is no similar statute pertaining to personal property rights, which these would be copyrights. So because that process did not run its course, Aquarian Foundation never acquired the copyrights. So your position, just so I'm clear, is that these were not works for hire. Reverend Reinhardt had the sole and exclusive right to deal with them. He created them. And he had the inherent power to issue licenses, including to your client. Yes, Your Honor. But he did not have the right to express in his will that the rights to these things went back to the foundation. Well, I think he very well could have set it out in his will and if they had completed the probate process to the end and then got an order of distribution, then they would have the standing necessary to sue under those copyrights. But they never followed through. They never completed the probate. So let's jump ahead because there's a lot of, this case has like if this, then that type. Okay. So go to section 203. Do you agree that Aquarian is not a statutory error? I do. Okay. So now talk about the consequence of that.  Well, here's the consequence. There are several consequences. One is, section 203 describes who can exercise the right of termination, how they exercise it, and when they can exercise it. And Aquarian Foundation failed all three of those tests. First of all, they're not a statutory error. If you look at the- But then, if they're not a statutory error, why does it matter? Why does section 203 come into play in the first place? Well, I think it's because the language of section 203, when it, what it refers to the, it says that the termination interest is owned by, and in fact, when you go down the list of people it's owned, it uses the words entirely owned by. So the termination statute essentially carves off the termination rights for a copyright from what would otherwise be their normal owners. It refers to the termination, the termination right is owned exclusively by, and then it lists four different classes of statutory errors. There's no, there has been some discussion about whether Reno should be abrogated, but here's the thing, when you look at abrogation, you would have to look at those three issues separately about the who, the how, and the when, and examine the abrogation issue on each one of those. The statute, when it refers to something being owned entirely by, that is clearly a preemption of state law because normally state law would be what is applied in determining ownership. So- I guess I'm, I feel like I'm in a circular argument because if they are not a statutory error, then section 203 doesn't apply. And we have a situation here where they're not a statutory error. So it's not that the only termination rights in the world for copyright are governed by section 203. My understanding of the statute is that statutory errors rights come under 203. And those are special carve out as to the timing. Our argument is that statute, that section 203, only allow, when you have an indefinite duration, that was by a deceased author, that those termination rights are only owned by, they are only owned exclusively by those statutory errors. Could I ask you to keep in front of the microphones? Yes. I know you're focusing your questions to my colleague, but we have to be able to hear, and these things are recorded. Yeah, but what I said was, is that the- I heard what you said. I'm just asking you to stay right there if you can. Yeah, and the use of the words entirely owned by indicates that those are the only classes of people who may exercise it at all. And then if you go beyond that, there were additional time considerations. You know, by the way, there never was a termination of the interest relative to this case. What they urged were, they said, well, there were two terminations. One is they sent out a bunch of DMCA notices. Okay, that's the first what they claim is a termination. Those DMCA, they don't make any reference to the license. At that time, Aquarian was unaware of a license. When they heard about it, they disputed its existence. So they've never actually terminated that license. What we then find is that in two years into the litigation, after Aquarian hired its present counsel, they promptly sent out the notice purporting to terminate the rights. But if that's effective, it's effective forward-looking. It wouldn't have affected any of the alleged infringements that were involved in this case. So if the DMCA notices aren't effective notice in some way, you're saying that there was a termination notice down the road, but that that notice didn't affect any of the claimed copyright infringements. Yeah, yeah, exactly. You can't retroactively terminate something. But you know, even that notice was defective in that it didn't meet the timing requirements of Section 203. That's assuming 203 applies. Correct. But if 203, what if 203 doesn't apply? Then there's not a timing requirement, correct? There would not be if it didn't apply at all. That's true. You know, one thing though, that needs to be said here about the termination. You know, they have urged that this was terminated by, well, let me put it to you this way. At the trial court level, there was never any argument that they had the right unilaterally to terminate a license of indefinite duration. It was never argued below. The first time you see that argument is in their appeal brief, okay? At which time they brief Washington law and Colorado law. So no court, including the Judge Martinez, no court has yet weighed in on whether under state law, there is the right to terminate a license without cause that is of indefinite duration. It's not been determined. And I think that even when you look at the cases that Aquarian cited, even when you look at the Washington case they cited, they said that, well, whether or not it can be terminated, it's ultimately a question of the intention of the parties. Okay, so here's the thing is, when you raise it on appeal for the first time, what that also means is that the court never had the ability to weigh in on an issue like that about the intention of the parties of whether it would ever be terminable. And we never had that right either, okay? If we were determined that the rights did transfer to Aquarian, your argument, as I understand it, is even so the termination notice was either ineffective or not given or not litigated, which would require a remand? What I would say is that it was never terminated until the midst of the litigation. It was never signed. It was never referenced, the license, and factually. So that fact is in the record. But beyond that, there is an unresolved issue of state law, which is to say, when may a license be terminated? Can you just unilaterally? Here's the thing is, this was not just a unilateral, gratuitous grant of a license. It was a grant for consideration because it required the sharing of revenues that were gonna be derived from it. Do you think we would look at that issue de novo? Well, it would, the question is under state law, which, first of all, you'd have to decide, is this Colorado law or is this Washington law? In most cases, it doesn't matter, but let's just assume they were the same. Okay, in Washington law, the case that was cited pertaining to termination of indefinite duration, the language of the court was that it would look to the intention of the parties as to whether that was allowable or not. And that's a factual issue. That, assuming it was intended to be terminable, there was no evidence of record in it, nor could there be, because here's the simple truth. All of Aquarian's witnesses in this case arrived on the scene long after this license agreement was drafted. One other last closing remark I had to make. I don't know if you're not looking at the clock. You're two minutes and 30 seconds over your time. So would you like to wind up? Yes, sir. My windup is this. The, by the way, Aquarian Resources, there's no evidence that they were used in the creation of this work. That was one of the findings of the court. And lastly, I would ask that the court take a close look at our claim for attorney's fees in this matter, because there was evidence, manufactured evidence, there was evidence that was held back, and so forth. So those are, that does make this an extraordinary case. Thank you. Thank you, counsel. All right, Mr. Billick, you had a minute left for rebuttal. Thank you, and thank you to opposing counsel. Would you address the specific issue of whether the termination was effective just by sending the DMCA letters? And if those don't constitute termination, when was the termination in your view? Well, for the reasons that we cited in our brief, the DMCA notices contain all the same hallmarks that you would need to refute a license. It is, you have a swearing of affirmation, you have someone with- Well, you basically say, hey, quit violating my copyright.  But you don't say, you might have a license, but I hereby terminate it. Those are kind of two different things. Agreed, but as opposing counsel just pointed out, the church didn't know that the license was even out there. And so how could the church possibly have terminated this license when they had no knowledge of it? For all they know, they see some infringement. And so, the other point I wanted to get to is- When is the first time that the church knows there's a license? It would have been, and this is, it would have been sometime in 2014 during the early years of the DMCA practice where I believe, I don't have the record site top of my head, but I believe Mr. Lowndes, when he responded to those notices, he said that, hey, I have a license, which to the church was outlandish because again, their articles and bylaws prevent the- I understand, but did you then say, when did you say, not you, but the church say, no, you don't have a license. Or if we did, it's either invalid at the outset or if you had one, it's over. When did that come about? I don't know. Because he's suggesting it was after the alleged violation or the alleged infringement. It certainly would have been after the infringement, certainly, because again, the church had no idea that this license even existed until the infringement was spotted. So council, I recognize that we gave your friend on the other side a little extra time. So I'm going to give you one more minute so you can wrap up your rebuttal. Thank you. The church is not a statutory heir under section 203. And if you look to the legislative intent of section 203, you'll see why that's an important point. And in the statute, the word only does not exist. So to limit, to essentially elbow out the church from ever being able to terminate a license under the guise of 203 would essentially, in effect, would have granted Mr. Lowndes an assignment because it could never be terminated because Reverend Reinhart had no heirs. That would be covered by the statute. And as far as, and this is another distinguishing point on this case versus Rano. So if this court is not inclined to limit or abrogate Rano, then another point to look at would be that Rano, I believe, dealt with the author himself trying to terminate the license, which he, of course, is the author. He's covered by 203. The church, not a statutory heir, not covered by 203. And therefore, this is why this case should be treated differently. Last two points here. One, the work for hire, the church is entitled to the presumption under 17 U.S.C. 201B as in boy, that these works ought to be treated as works for hire unless a written instrument is provided, signed by the two parties to be bound. We do not have that in this case. And so that presumption was not rebutted. Last thing. As to the issue of the will and whether it was closed or not, if you turn to the docket, and we have this cited in our brief as the record site, in the will docket, it says order closing estate. I don't know how else you can get clearer than that when you're trying to wrap up probate. So with that, thank you very much for your time. Thank you, counsel. To both of you, the matter is now submitted.
judges: HAWKINS, McKEOWN, ALBA